UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| HOWARD ALVIN WILCOX,  :  <br>     Petitioner,  : <br> : <br> v.  : <br> : <br> MARK STRANGE,  : <br>     Respondent.  : | PRISONER CASE NO: <br> 3:01-cv-720 (WWE) |

RULING ON PETITION FOR WRIT OF HABEAS CORPUS

The petitioner, Howard Wilcox, currently confined at the MacDougall Correctional Institution in Suffield, Connecticut, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction on the charge of kidnapping in the first degree, sexual assault in the first degree, attempt to commit sexual assault in the first degree, assault in the third degree and falsely reporting a motor vehicle theft. For the reasons set forth below, the petition will be denied.

I.    Procedural Background

On November 17, 1997, in the Connecticut Superior Court for the Judicial District of Middlesex, a jury convicted the petitioner of one count of kidnapping in the first degree in violation of Connecticut General Statutes § 53a-92(a)(2)(A), one count of sexual assault in the first degree in violation of Connecticut General Statutes § 53a-70(a)(1), one count of attempt to commit sexual assault in the first degree in violation of Connecticut General Statutes § 53a-49(a)(2) and 53a-70(a)(1), one count of assault in the third degree in violation of Connecticut General Statutes § 53a-61(a)(1), and one

count of falsely reporting a motor vehicle theft in violation of Connecticut General Statutes § 14-198.[1]  The court sentenced the petitioner to forty years of imprisonment suspended after thirty-four years and followed by ten years of probation.  The petitioner raised three grounds in support of his appeal to the Connecticut Supreme Court.  He claimed that:

> (1) the state improperly suppressed exculpatory evidence; (2) the trial court improperly imposed a fixed term of incarceration for the kidnapping conviction in violation of General Statutes § 53a-37; and (3) the state failed to present sufficient evidence that the defendant had committed first degree kidnapping, first degree sexual assault and attempted first degree sexual assault.

State v. Wilcox, 254 Conn. 441, 443-44, 758 A.2d 824, 827 (2000).  On September 5, 2000, the Connecticut Supreme Court affirmed the judgment of conviction.  Id. at 469, 758 A.2d at 840.  On April 26, 2001, the petitioner filed the present action.

II.     Factual Background

Based on the evidence at trial, the Connecticut Supreme Court determined that the jury could have found the following facts.

> During the evening of September 16, 1996, the victim, walked the short distance from her home in East Haddam to J.R.'s Café in Moodus. The [petitioner], with whom the victim was not acquainted, already was at the bar when she arrived. The victim remained at J.R.'s for approximately one and one-half to two hours during which time she had several drinks, danced and conversed with acquaintances. The

---

[1] The jury found the petitioner not guilty of a second count of sexual assault in the first degree in violation of Connecticut General Statutes § 53a-70(a)(1) and one count of criminal attempt to commit murder in violation of Connecticut General Statutes § 53a-49(a)(2) and 53a-70(a)(1).

2

victim also asked the [petitioner] to dance, tugging his arm to encourage him to join her on the dance floor. After dancing with the victim, the [petitioner] bought the victim a drink and they conversed for a few minutes thereafter.

At approximately 12:30 a.m. on September 17, 1996, the victim left the bar and started walking home. The [petitioner] exited the bar immediately after the victim. As the victim walked down one of the driveways leading away from J.R.'s, the [petitioner] drove up next to her and offered to drive her home. The victim accepted his offer and voluntarily entered the [petitioner's] vehicle. The victim gave the [petitioner] directions to her home, but he failed to turn onto her road as instructed. The victim attempted to exit the moving car by opening the door, but the [petitioner] grabbed her by the arm and pulled her back into the vehicle.

The [petitioner] then drove the victim to a remote area of Cockaponset State Forest, where he pulled her out of the car onto the wet ground[2] and pulled her shorts and underpants down around her ankles. The [petitioner] squeezed his hands around the victim's neck, choking her, and then performed oral sex on her. The [petitioner] also touched the victim's breasts, vagina and buttocks with his hands, mouth and penis. During this period the [petitioner] told the victim that she "deserved it." While the [petitioner] again attempted to perform oral sex on her, the victim managed to kick him away and flee through the woods, pulling up her shorts and underpants as she ran. As the victim ran away, she lost one of her shoes, a sock and her driver's license, which she had kept in her sock. The victim hid for a period of time beneath a tree.

Eventually, the victim walked to a house adjacent to the woods where she knocked on the door and asked for help. The victim, who had mud on her clothes and body, and marks around her neck, appeared to have been involved in a struggle. Georgia Marica, one of the occupants of the house, testified that the victim appeared to be terrified.

---

[2] "Evidence was presented at trial that established that it had been raining periodically over the course of the evening."

Inside the house, the victim telephoned her father and told him that she had just been raped. Marica notified the police, who arrived shortly thereafter.

In response to the victim's report of a sexual assault, the police conducted a search of the area for any suspects or vehicles. During the early morning of September 17, 1996, the police located the [petitioner's] vehicle approximately 100 feet off a road leading into Cockaponset State Forest. The vehicle's windows were rolled down and the interior was wet due to the rain. A canine search of the vicinity around the vehicle uncovered the victim's shoe, sock and driver's license and the [petitioner's] set of keys.

At approximately 6 a.m. on September 17, 1996, the [petitioner's] girlfriend, Toni Bartlotta, reported the [petitioner's] vehicle as stolen to the state police. Officers went to the [petitioner's] apartment in Deep River in response to the stolen vehicle report and, upon arriving at the apartment, observed Bartlotta cleaning broken glass panes from the front door. The [petitioner] provided the officers with oral and written statements alleging, inter alia, that he had parked his vehicle outside the Old Lyme Tavern in East Lyme the previous evening and later went home with a friend. The [petitioner] further claimed that, when he returned to the Old Lyme Tavern the next morning to retrieve his vehicle, it was missing.

Later the same day, a detective for the state police went to the [petitioner's] home and requested that the [petitioner] go down to the state police barracks in order to identify his vehicle and further discuss the previous night's events. At the barracks, the [petitioner] told police that in his previous statement he had lied about his vehicle being stolen because he had been out with another woman the previous evening and did not want his girlfriend to find out.

The [petitioner] then provided the police with a second version of the previous evening's events, claiming that he had met the victim at J.R.'s, engaged in conversation with her and offered her a ride home when he saw her walking outside the bar. The [petitioner] further stated that they drove to Cockaponset State Forest, parked the vehicle and began kissing and caressing. The [petitioner] then removed the victim's shirt and shorts and performed consensual oral

>sex on her in the front seat of the vehicle. The [petitioner] claimed that they then decided to have sexual intercourse and the victim laid down on the wet ground next to the car. The [petitioner] further told police that when he was unable to maintain an erection, the victim became angry and got dressed. The [petitioner] claimed that he had then realized that the victim had taken his car keys and, as the victim started to walk away from the car, he reached out, attempting to recover his keys from her. The [petitioner] alleged that as he reached out, he tripped over a rock and accidentally grabbed the victim's neck. The victim then ran away, and the [petitioner], unable to find his keys, walked home, breaking the glass in his front door in order to gain entry.
>
>The following day, the [petitioner] contacted the state police and again revised portions of his earlier statement. The [petitioner] provided a third version of the events, claiming that when he left J.R.'s he found the victim passed out in the front seat of his car. The [petitioner] woke up the victim and she agreed to go for a ride with him. The [petitioner] did not alter his previous statements concerning the rest of the evening's events.  The [petitioner] was arrested later that day.

Id. at 444-48, 758 A.2d at 828-29.

III.   Standard of Review

The federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in state custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court.  See Estelle v. McGuire, 502 U.S. 62, 68 (1991); Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), significantly amended 28 U.S.C. §§ 2244, 2253,

2254, and 2255. The amendments "place[] a new constraint" on the ability of a federal court to grant habeas corpus relief to a state prisoner with respect to claims adjudicated on the merits in state court. Williams v. Taylor, 529 U.S. 362, 412 (2000) (taken from the portion of the opinion delivered by Justice O'Connor). The federal court cannot grant a petition for a writ of habeas corpus filed by a person in state custody with regard to any claim that was rejected on the merits by the state court unless the adjudication of the claim in state court either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The federal law defined by the Supreme Court "may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir. 2002).

A decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court] has done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002). A state court decision is an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the particular case." Id. When considering the unreasonable application clause, the focus of the inquiry "is on whether

the state court's application of clearly established federal law is objectively unreasonable." Id.  The Court has emphasized that "an unreasonable application is different from an incorrect one."  Id. (citing Williams, 529 U.S. at 411 (holding that a federal court may not issue a writ of habeas corpus under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").  In both scenarios, federal law is "clearly established" if it may be found in holdings, not dicta, of the Supreme Court as of the date of the relevant state court decision.  Williams, 519 U.S. at 412.

When reviewing a habeas petition, the federal court presumes that the factual determinations of the state court are correct.  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  See Boyette v, Lefevre, 246 F.3d 76, 88-89 (2d Cir. 2001) (noting that deference or presumption of correctness is afforded state court findings where state court has adjudicated constitutional claims on the merits).

Collateral review of a conviction is not merely a "rerun of the direct appeal." Lee v. McCaughtry, 933 F.2d 536, 538 (7th Cir.), cert. denied, 502 U.S. 895 (1991).  Thus, "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."  Brecht v. Abrahamson, 507 U.S. 619, 634 (1993) (citations and internal quotation marks omitted).

IV.    Discussion

The petitioner argues that the prosecutor withheld exculpatory statement's of the victim which were favorable to the defense and could have been used by him to further

impeach the victim's credibility at trial.   Because this ground was raised on direct appeal, the petitioner has exhausted his state court remedies with respect to each ground for relief.  Further, because the facts regarding these claims are not disputed by the parties, the court concludes that no evidentiary hearing is required in this case.

The Connecticut Supreme Court determined that the following additional facts were relevant to this claim.

> On January 9, 1997, Michael Dankulich, a victim's advocate, interviewed the victim in order to assess her counseling needs and compensation issues, to provide her with information, and to assist her in obtaining information from the state's attorney's office.[3]  Prior to the interview, the assistant state's attorney, Timothy Liston, wrote a brief note to Dankulich, requesting that he clarify with the victim "where and why she got in the car with [the petitioner]." Following his interview with the victim, Dankulich wrote a responsive note to Liston, stating that the victim indicated that "she got into [the petitioner's] car in the parking lot of the bar, not while walking down the road [and that] when asked why she got in the car she related that she had been drinking and that [James Lawrence] who was in the bar told her that [the defendant] appeared to be OK to accept a ride from. [Lawrence] is a friend of [the] victim's." Thereafter, the notes were placed in the state's attorney's file.
>
> On December 23, 1996, the [petitioner], pursuant to Practice Book §§ 40-11[4] and 40-13,[5] formerly §§ 741 and 743,

---

[3]   "Among its powers, the office of the victim advocate has the authority to evaluate services provided to victims by state agencies, to coordinate services for victims and to recommend changes in policies concerning victims. See General Statutes § 46a-13b et seq. Victim's advocates become involved in criminal cases through a referral from a state's attorney or from their own review of the cases in the state's attorney's office."

[4]   "Practice Book § 40-11 provides in relevant part: 'Disclosure by the Prosecuting Authority; Information and Materials Discoverable by Defendant as of Right '(a) Upon written request by a defendant filed in accordance with Section 41-5 and

8

> respectively, filed a request for disclosure and production. In response to the request, the state provided the defendant with numerous documents including police reports, test results and photographs. Over the ensuing months, the state continued to provide relevant documents in compliance with the production request. On January 28, 1998, following the return of the jury's verdict and just prior to sentencing, Liston turned over to the [petitioner] the notes exchanged between himself and Dankulich, enclosing them in a letter indicating that he recently had found the correspondence in his file.
>
> Immediately thereafter, the [petitioner] filed a motion for a mistrial, pursuant to Practice Book § 42-43,[6] formerly § 887,

---

without requiring any order of the judicial authority the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items:
"(1) Exculpatory information or materials....
"(b) In addition to the foregoing, the defendant shall be entitled to
disclosure of exculpatory materials in accordance with any applicable constitutional and statutory provisions."

[5] Practice Book § 40-13 provides in relevant part: "Names of Witnesses; Prior Record of Witnesses; Statements of Witnesses Discoverable by the Parties as of Right
"(a) Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose to the defendant the names and, subject to the provisions of subsections (g) and (h) of this section, the addresses of all witnesses that the prosecuting authority intends to call in his or her case in chief and shall additionally disclose to the defendant:
"(1) any statements of the witnesses in the possession of the prosecuting authority or his or her agents, including state and local law enforcement officers, which statements relate to the subject matter about which each witness will testify...."

[6] Practice Book § 42-43 provides: "Motion for Mistrial; For Prejudice to Defendant

>and a motion for a new trial pursuant to Practice Book § 42-53,[7] formerly § 902. At the hearing on the motion, the [petitioner] argued that the state's failure to disclose the correspondence had deprived him of his rights to due process and a fair trial according to the standard enunciated in Brady v. Maryland, upra, 373 U.S. at 87, 83 S.Ct. 1194. The trial court concluded that the [petitioner] had met the first two prongs of the Brady standard by demonstrating (1) that the notes, which were eventually turned over on January 28, 1998, had been suppressed, and (2) that, because the notes contained impeachment evidence, they were favorable to him. Nevertheless, because it concluded that the [petitioner] had not established the materiality of the notes in accordance with the third Brady requirement, the trial court denied the motions.

Id. at 448-451, 758 A.2d at 829-31

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to

---

"Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case. If there are two or more defendants, the mistrial shall not be declared as to a defendant who does not make or join in the motion."

[7] Practice Book § 42-53 provides: "Motion for New Trial; In General
"(a) Upon motion of the defendant, the judicial authority may grant a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his or her asserting the error, the judicial authority shall grant the motion:
"(1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or
"(2) For any other error which the defendant can establish was materially injurious to him or her.
"(b) If the trial was by the court and without a jury, the judicial authority, with the defendant's consent and instead of granting a new trial, may vacate any judgment entered, receive additional evidence, and direct the entry of a new judgment."

10

punishment, irrespective of the good or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).  The duty to disclose applies to impeachment evidence as well as exculpatory evidence.  See United States v. Bagley, 473 U.S. 667, 676 (1985).  The evidence is considered material and, thus, subject to disclosure, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682; see also Kyles v. Whitley, 514 U.S. 419, 433-34 (1995).  "There are three components of a true Brady violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either wilfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

Suppressed information is considered material if "there is a reasonable probability that the result of the trial would have been different if the suppressed documents [or information] had been disclosed to the defense." Strickler, 527 U.S. at 289.  "'[T]he adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Id. at 289-90 (quoting Kyles, 514 U.S. at 434).  Thus, to prevail on his Brady claim, the petitioner must demonstrate a reasonable probability that the result of the trial would have been different if the suppressed evidence had been provided, thereby undermining confidence in the verdict.  See id.

In its analysis of the alleged Brady violation, the Connecticut Supreme Court noted that the trial court had concluded that the petitioner had met the first two prongs

11

of the standard.  See Wilcox, 254 Conn. at 453, 758 A.2d at 832.  Accordingly, the Connecticut Supreme Court characterized the petitioner's claim as a challenge to the trial court's determination regarding the materiality of the victim's statements.

The Connecticut Supreme Court determined that there were only minor differences between the victim's statements to the advocate and her testimony at trial.  See id. at 455-56.   Thus, the court concluded the impeachment value of the suppressed statements was limited.  The court also noted that the petitioner had sufficient opportunity to cross-examine the victim as to details surrounding her entry into the petitioner's vehicle and to highlight inconsistencies in her testimony concerning her familiarity with the petitioner prior to the incident in question.  See id. at 457-58.  Furthermore, the court noted that the prosecution offered substantial independent physical evidence and witness testimony to corroborate the victim's testimony concerning the events.   See id. at 458-60. Thus, the court concluded that the prosecution's case did not rely solely on the testimony and credibility of the victim.  The court held that the victim's statements to the advocate would not have undermined confidence in the verdict had they been offered at trial because of the cumulative nature of the statements, the petitioner's ample opportunity to cross-examine the victim concerning her prior inconsistent statements and the introduction of  independent physical evidence and witness testimony at trial that supported the victim's story and the jury's verdict.  Thus, the suppressed statements did not rise to the level of materiality required by Brady.

This court cannot conclude that the Connecticut Supreme Court's analysis is contrary to or an unreasonable application of Supreme Court precedent.  Accordingly,

the petition for a writ of habeas corpus is denied.

IV. <u>Conclusion</u>

The petition for a writ of habeas corpus [**Dkt. No. 2**] is **DENIED**. Because the petitioner has not made a showing of the denial of a constitutional right, a certificate of appealability will not issue. The Clerk is directed to enter judgment and close this case.

**SO ORDERED** this <u>29th</u> day of September, 2004, at Bridgeport, Connecticut.

_____/s/_____
Warren W. Eginton
Senior United States District Judge